## DAVID A. SECOMBE ET AL. *v.* FRANKLIN STEELE.

When a transcript of a record of another court was attached to the answer as an exhibit, and portions of it particularly referred to, and the record of the entire case pleaded, a decree, certified by the clerk, which had been executed by the parties, must be considered as part of the record, although it had not the signature of the judge. The signature of the judge is not the only evidence by which a decree can be authenticated.

Property was agreed to be sold, and the payment was to be made by a deposit of the price in one of two banks, in Boston, and a certificate delivered to the vendor. The vendee made the deposit in another bank, in Boston, and tendered the certificate to the vendor, within the time limited, and the vendor having refused to receive it, he tendered the purchase-money and interest, and that being refused, he filed his bill for a specific performance, and paid the money into court. Held, under the circumstances, to be sufficient.

Creditors of the vendor, who recovered judgments and sold the property, pending a suit for a specific performance, in which the purchase-money had been paid into court, are not necessary parties to the suit, nor are the purchasers at the sheriff's sale under such judgments.

Under a statute of Minnesota, the court of chancery might divest the title of the defendant in the land, without requiring him to make a conveyance.

THIS case was brought up, by writ of error, from the Supreme Court of the Territory of Minnesota.

By stipulation of counsel, Secombe was made the representative of numerous other parties engaged in a common cause.

The chronological history of the case was this.

In the latter part of 1851, suits were pending between Steele and Arnold W. Taylor, with regard to their respective interests in a parcel of land near St. Anthony's Falls, of which they were tenants in common.

On the 17th of January, 1852, Taylor executed his bond of conveyance of the property to Steele, for the consideration of twenty-five thousand dollars, one thousand of which was to be paid in cash, and the remaining twenty-four to be deposited to the credit of Taylor, within sixty days, in the Merchants' or Suffolk Bank, in Boston.

On the 19th of January, 1852, this bond of conveyance was

recorded in the proper office, under the following provisions of the Minnesota Revised Statutes, chap. 47, p. 215:

"SEC. 1. All bonds, contracts, or agreements, concerning any interest in lands in this Territory, made in writing under seal, attested by one or more witnesses, and acknowledged before some person authorized by law to take acknowledgments of deeds, may be recorded in the office of the register of deeds of the county where the land lies.".

"SEC. 3. Each and every bond, contract, or agreement, made and recorded according to the provisions of the first section of this chapter, shall be notice to, and take precedence of, any subsequent purchaser or purchasers, and shall operate as a lien upon the lands therein described, according to its import and meaning."

One of the questions which arose in the case was with reference to the import and meaning of the bond.

It was alleged by Steele that, on the 17th of March, 1852, he tendered to the Suffolk Bank, and also to the Merchants' Bank, in Boston, the sum of twenty-four thousand dollars, and requested a certificate of deposit therefor; but that each of the banks refused to receive the money. In consequence of such refusal, he deposited the money in the Bank of Commerce, at Boston, and received a certificate of deposit from that bank. On the 5th of May, 1852, he tendered this certificate to Taylor, who refused to receive it or to execute a deed of conveyance.

On the 25th of May, 1852, Steele filed a bill in equity, (that form of proceeding not having been then abolished,) praying for a specific performance of his contract with Taylor, and paid into court the sum of $24,240. He also obtained an injunction prohibiting Taylor from selling or encumbering the property, &c. Taylor answered the bill, and moved to dissolve the injunction, which motion was overruled, and the case stood for hearing upon bill and answer in July, 1852.

During the winter of 1852–'3, whilst the cause was pending as above described, Secombe and other creditors of Taylor obtained judgments against him, sued out executions which were levied upon the property included in his bond to Steele, and at the sheriff's sale the plaintiffs in error became purchasers, receiving deeds for their respective purchases.

In March, 1853, Secombe and the other purchasers petitioned to be admitted as parties to defend the suit against Taylor, which petition was granted, and a certain time given for the filing of their answers.

In April, 1853, Steele moved to vacate this order and dismiss the petitions.

Affidavits were filed on both sides, and on the 4th of May, 1853, the order was vacated, and the petitions dismissed.

From this order, Secombe took an appeal to the Supreme Court of the Territory.

On the same 4th of May, a decree was made by the court, whereby Taylor was ordered to execute conveyances to Steele, and the sum of $24,240, which had been deposited in court, was ordered to be paid to Taylor. This decree was founded on the consent of Steele and Taylor, filed in court.

Pending the above appeal, Steele instituted the suit now under the consideration of this court against Secombe and fifty-three other persons, who claimed under the sheriff's sales. It was an action at law, brought under a local statute, by way of petition. The plaintiff was in possession, and brought the suit against the persons who claimed an estate or interest in the property. The petition was constructed like a bill in chancery, and, after reciting the facts in the case, concluded thus: "wherefore the plaintiff demands judgment, determining the title to the said real estate so conveyed to him by the said Arnold W. Taylor to be in the plaintiff, and requiring the defendants, respectively, to release their said adverse claims to estates or interests therein to the plaintiff," &c.

The defendants answered; the plaintiff demurred; the court sustained the demurrer, and gave the defendants leave to file an amended answer.

The amended answer introduced the record of the former suit; when the plaintiff moved to strike out all that part of the answer, and demurred to the residue. The court sustained the motion and demurrer, and gave judgment for the plaintiff, which on appeal was affirmed by the Supreme Court of the Territory.

A writ of error brought the case up to this court.

It was argued by *Mr. Carlisle* and *Mr. Badger* for the plaintiffs in error, and by *Mr. Cushing* and *Mr. Gillet* for the defendants.

The points made by the counsel for the plaintiffs in error were the following:

I. That Taylor's estate in the lands was the subject of execution; and that the same passed to the plaintiffs in error, in respective parcels, subject to whatever equity Steele might establish in the then pending suit in equity. It was the legal estate which was seized and sold. But even if it were otherwise, it was still the subject of execution. (Revised Statutes,

*Secombe et al.* v. *Steele.*

p. 363, sec. 91—p. 346, sec. 139—p. 361, secs. 76, 77; 2 Story's Eq. Jur., secs. 1049-'50-'51.)

II. That the title thus acquired was "by operation of law," or, in other words, by involuntary assignment; and therefore not even a decree thereafter passed against Taylor would have affected such title; his assigns, by operation of law, not being parties to the same. (Story Eq. Pl., sec. 342 and notes—sec. 351 and note; Sedgwick *v.* Cleaveland, 7 Paige, 290; Boring *v.* Lemmon, 5 H. and J., 225; Bennet *v.* Williams, 5 Ohio, 462; Deas *v.* Thom, 3 J. R., 543; Storm *v.* Davenport, 1 Sandf. C. R., 135.)

III. That, by virtue of the title so acquired, the plaintiffs in error were subrogated to Taylor's rights in respect of the purchase-money, in the event of Steele's equity upon the lands being established. Therefore, they had an "adverse claim, estate, or interest," in the lands, which was to be "determined" in this suit. For the lands stood as security for the purchase-money, and they holding the legal titles could not be decreed to convey, or otherwise be divested of the same, without their consent, except on payment of the purchase-money. (Moyer *v.* Hinman, 17 Barb. S. C. Rep., 137, and cases cited by the court in that case; Tomlinson *v.* Blackburn et al., 2 Iredell's Eq. Rep., p. 509, and cases then cited by the court.)

IV. In fact there was no decree even against Taylor. What is erroneously printed as part of the record, under title of "Copy of consent for decree," and "Copy of decree," never were part of the record, nor in this cause for any purpose. But if such decree, by consent, had been passed, it would have been, in effect, the mere act of the parties. It is for this reason that no rehearing or appeal lies in such case. (Webb *v.* Webb, 3 Swan, 368; Lansing *v.* Alb. Ins. Co., Hopk., 102; Bradish *v.* Gee, Amb., 229; Harrison *v.* Ramsey, 2 Ves., 288; Belt's Supp., 413.)

Disregarding these principles, the court below so proceeded as to debar these plaintiffs in error from setting up any "adverse claim, estate, or title," in these lands, whether by reason of defect in Steele's equity, or by way of holding the legal titles as security for the purchase-money; and this in a suit brought against them "to determine such adverse claim, estate, or title," and while their appeal was pending from the decree dismissing their petitions in the original suit between Taylor and Steele.

The special errors which have led to this result, and which are now assigned, are as follows:

1st. The Supreme Court of Minnesota erred, in that it did not reverse the order of the District Court in this suit, grant-

ing the motion of the plaintiff, Steele, to strike out portions of the answer of Secombe, (by stipulation answering for all the defendants.)

*a.* The first, fourth, fifth, and eighth portions of the said answer, stricken out by the said order, were directly responsive to allegations contained in the plaintiff's complaint, tendering material issues necessary to be decided in order to the " determining the adverse claim, estate, or interest," of the defendants; for which purpose, only the action was authorized by statute, (*ubi supra*,) and even if not absolutely material, they were issues tendered by the plaintiff, and it was not for him to object that the defendants occupied the ground which he had opened.

*b.* The second portion of the said answer, so stricken out, tendered to the plaintiff a material issue. The action being "for the purpose of determining such adverse claim, estate, or interest," it is difficult to perceive how the defendants could be denied the right to show that the land which they had purchased was clear of the pretended equity of Steele. This portion of the answer was equivalent to a plea of non-performance of the conditions of the bond, and whether such plea was true or false, in fact, was the very matter to be tried. But the court refused to allow any such issue to be made.

*c.* The sixth and seventh portions, so stricken out, alleged fraud and collusion between Steele and Taylor, to defraud and defeat the creditors of Taylor, and purchasers at the sheriff's sale; and were therefore proper to be inquired into, in law and fact, as at once impeaching the plaintiff's alleged right, and fortifying the defendants' titles.

2d. The said court erred, in that they did not reverse the order and judgment of the District Court sustaining the demurrer to the residue of the defendants' answer.

*a.* The first special cause of demurrer assigned, is to the effect that the bond to convey, on conditions performed, vested such a title in Steele as absolutely precluded these plaintiffs in error from setting up any "adverse claim, estate, or title," in the land, whether as free of the pretended equity of Steele, or (conceding it) as security for the payment of the purchase-money. This pretension is based upon the supposed effect of the recording of the bond. But it is evident that the record has no other effect than that of constructive notice of the contents of the bond.

*b.* The second cause assigned is, that the answer assumes that the title of Steele is founded upon the proceedings in equity; whereas, the demurrer asserts that it is wholly independent of that suit. This is shown to be erroneous, if the principles hereinbefore asserted are correct. Although Steele's

alleged equity was founded on the bond, his right to the lands upon which the plaintiffs in error held this "adverse claim, estate, or interest," was not determined, unless it was determined in that suit. And if they had such "adverse claim, estate, or interest," it is evident that there was never any adjudication thereon, since they were dismissed from that suit, and their appeal from that decree was still pending.

*c.* The third cause assigned is, that whereas the answer sets up that there was no decree as against Taylor, yet it appears from the "paper-book," exhibited with the answer, that there was such a decree. But it will be observed that it is only certain specified papers which are referred to in the answer, and reference is made to the paper-book for true copies of these only. Besides, it has already been shown that this was only the *form* of a decree, not signed or enrolled; and that even if it had been signed or enrolled, it was by consent, and is only the act of the parties; and that it could not affect the "adverse claim, estate, or interest," of the plaintiffs in error, which was the subject-matter of this suit.

The counsel for the defendant in error maintained the following propositions:

1. The agreement between Steele and Taylor for the sale of the land was a *bona fide* and fair transaction, and is unimpeached, and constituted a valid lien upon said land, and Steele's interest therein was unaffected by the purchase of Secombe and others.

2. That Steele performed the agreement on his part, and the title in him became complete upon the execution of the deeds to him by Taylor.

3. That Steele paid Taylor the full face of the agreement is not denied, but is admitted by the pleadings and proved by the record attached to the defendants' answer, and especially by their petitions to share in the money paid into court by Steele for Taylor.

4. That the deeds from Taylor to Steele conform to the terms of the agreement and the requirement of the decree.

5. Under the decree, the title was perfect without the execution of the deeds.

6. The pleadings in the equity case, and also in this suit, show facts upon which a court of equity would compel a performance by Taylor of his agreement to convey to Steele.

7. That at the time of the sheriff's sales, under which the defendants claim, Taylor had no estates in the land which he could have transferred, the land belonging to Steele, and the purchase-money to Taylor, the claim of the latter upon the

land being that of security for the payment of the purchase-money.

8. The answers of the defendants present no material issuable facts.

9. That there is nothing before this court except the questions arising upon the answers after being amended by the order of the court, the final judgment being upon the remaining portions of the answer.

10. That the decree in the suit between Steele and Taylor cannot be impeached collaterally, but only by direct proceedings.

11. That the defendants had no right to intervene in the equity suit.

12. No appeal will lie from the motion to strike out portions of the defendants' answers.

13. Every material fact to show the right of Steele to the land is admitted in this case, and no fact set up in the answers shows any right in the defendants.

14. From the admitted facts in this case, if Taylor had conveyed to the defendants, instead of to Steele, the latter, on the performance of the agreement now shown by him, could have compelled them to convey to him.

Mr. Justice CAMPBELL delivered the opinion of the court.

This cause comes before this court upon a writ of error to the Supreme Court of the Territory of Minnesota.

The defendant in this court (Steele) instituted a suit in the District Court of Ramsey county, Minnesota Territory, against fifty-four defendants, to determine the validity of their "claim," "estate," or "interest," in certain real property at St. Anthony's Falls, in that county, of which he was possessed, and in which he claimed to have an estate in fee simple, under certain conveyances, which are appended to his complaint. This complaint shows that, in 1849, the plaintiff and Arnold W. Taylor were tenants in common of a parcel of land which includes the property in dispute, and so occupied it until 1852. A portion was laid off into town lots, some of which were sold; expensive mills and other improvements were projected and partially completed on it; and controversies arose, and suits were pending between them, when the parties, in January, 1852, came to an agreement of sale. By this agreement, Taylor contracted to sell to the plaintiff his interest in the real property unsold, and the money and securities taken for the lots sold, for the sum of twenty-five thousand dollars, and upon the condition that the plaintiff should acquit him from the payment of a certain demand, and assume his liabilities on

certain contracts for labor and building materials. Of this sum, one thousand dollars were to be paid presently, and the remainder was to be paid in sixty days from the date, at the Merchants' or Suffolk Bank, at Boston, and a certificate of deposit furnished to Taylor at St. Anthony's Falls; and in case of a default, the deposit of one thousand dollars was to be a forfeit. But if the payment was made in the manner stipulated, conveyances were to be executed by Taylor; and meanwhile he was to remain in the possession of the mill. The conveyances referred to in these articles were not executed until May, 1853, and purport to have been made in obedience to a decree of the District Court of Ramsey county, in a suit commenced by Steele against Taylor.

The complaint of Steele against the fifty-four defendants is, that they claimed an "estate," "interest," or "right," in that property, have from time to time declared that they were owners thereof, and have executed conveyances for a portion, and offer to sell or dispose of other parts, contrary to the right of the plaintiff.

The object of the suit is, to relieve the title of the plaintiff from the mischief of these adverse claims; to quiet his possession by means of a decretal order requiring the defendants to release them, or, in case of their failure to do so, that the judgment of the court may stand and be recorded in its stead. This proceeding is authorized by the revised statutes of Minnesota, ch. 74, sec. 1.

The twelve persons who are plaintiffs in this court, and were defendants in the District Court, appeared there, and severally claimed title to parcels of land included in the conveyances of Taylor to the plaintiff. Their claims respectively rest upon the facts, that between November, 1852, and April, 1853, judgments were rendered against Taylor in the District Court, upon which executions issued, and levies and sales were made of those parcels before May, 1853, in the regular course of judicial proceeding. At these sales the defendants were either purchasers or derive title from such persons.

The defendants aver that their title is paramount to that of the plaintiff; for that the plaintiff is not entitled to any benefit from the articles of agreement executed by Taylor, in January, 1852, and then recorded, because he failed to comply with the obligation to pay twenty-four thousand dollars as agreed to by him.

And to avoid the recitals in the deeds, to the effect that they were executed under a decretal order of the court, they say that in May, 1852, the plaintiff filed a bill in the District Court, to compel Taylor to a specific performance of the contract of

January preceding. That upon the bill the judge made an order for the payment of the twenty-four thousand dollars into court by Steele; and, upon the fulfilment of this fiat, that an injunction should issue to restrain Taylor from selling, conveying, or encumbering the property, or in anywise intermeddling with it. That an injunction and subpœna issued, and that Taylor appeared, answered, and unsuccessfully moved to dissolve the injunction, in July, 1852. That no other act was done by the plaintiff until April, 1853, when the rights of the defendants had attached by those purchases from the sheriff. That in March, 1853, the defendants applied to the District Court to be made defendants in the cause, which application was finally unsuccessful, and that the plaintiff and Taylor then fraudulently closed their controversy by a decree rendered by consent, under which the conveyances were made, and that their object was to defeat the claims of these defendants.

That, by this arrangement, the terms of the contract of January, 1852, were not adhered to, and that the twenty-four thousand dollars were not paid as stated in the deed.

It was a question in the District Court, as well as in this court, whether the decree and the agreement leading to it, that form a part of the record here, properly belong to the case. The defendants in the District Court maintained that it was pleaded by them. They are found in an exhibit to the answers—an exhibit which purports to be a transcript from a record in the Supreme Court of Minnesota, as furnished on an appeal from the District Court of Minnesota by the defendants, upon the decree disallowing their claim to be made defendants. Portions of this transcript are referred to in the answers, as forming material papers in the chancery suit, and the whole suit is referred to in the answers to support its allegations; and it is specifically set up and pleaded. We think, therefore, that the record of that suit, as it appears in the exhibit, must be taken as authentic, in deciding upon the sufficiency of the answer as a bar to the plaintiff's complaint. The decree purports to have been made by the court; it is formal, and disposes of the cause, and is only defective in not having the signature of the judge. But it comes from the legal custody, has been accepted by the parties, and acted on by them; and was certified to the Supreme Court of the Territory, as a paper in the cause. We do not regard the signature of the judge as indispensable to its authenticity. The statute that directs the signature must be considered as directory; and other evidence to establish its verity as a record of the court may be considered.

In the District Court, the plaintiff moved to strike out por-

tions of the answer, for insufficiency and on other grounds, and demurred to the residue. His motion and demurrer were sustained, and a final decree rendered for the plaintiff. This decree was affirmed on appeal to the Supreme Court, and the defendants in that court prosecute their writ of error to this court. The statutes of Minnesota prescribe: "That the court must in every stage of an action disregard any error or defect in the pleadings and proceedings which does not affect the substantial rights of the adverse party, and no judgment can be reversed or affected by reason of such error or defect." The question to an appellate court in the present case is, do the answers of the defendants, as pleaded by them, disclose a valid claim to the property in dispute, so as to bar the petition of the plaintiff for relief? No objection is taken to the validity of the contract of January, 1852, between the parties, Steele and Taylor. The record of that contract is notice to subsequent purchasers; and Steele, by the statutes of the Territory, was entitled to have "precedence of" them, and "a lien upon the land, according to the import and meaning of the contract." (Rev. Stat., ch. 47, sec. 3.)

It is not denied that the plaintiff paid one thousand dollars at the execution of the contract, nor that the twenty-four thousand dollars were paid within sixty days into a bank at Boston—a bank of solvency and credit—nor that a certificate of deposit within a reasonable time afterward was offered to Taylor, at St. Anthony's Falls; nor that, upon his refusal to take the latter, the money and interest were immediately tendered to him; and, upon a farther refusal, that relief was sought from a court of chancery, whose order for the payment of the money into court was promptly complied with. The precise grounds of complaint are, that neither the Merchants' nor Suffolk Bank was made the depository of the money; and a certificate from one of them has never been tendered to Taylor,· and that he has the right to rely upon the letter of his contract. No specification has been made of any injury or inconvenience suffered by him, as a consequence of the deposit having been made in the Bank of Commerce, rather than the banks mentioned in the agreement. And the plaintiff avers, that the only reason for the change was, the refusal of those banks to give a certificate of the kind mentioned.

At law, if there is an express agreement for the payment of the purchase-money, and the delivery of the conveyance of the land by a particular day, and at a particular place, the parties will be bound by it, and time will be of the essence of the contract. But, in equity, the estate bargained and agreed to be sold becomes the property of the purchaser as soon as the

ngreement is concluded. It will descend to his heirs at his death, or may be devised by him; while the purchase-money vests in the vendor, and forms a part of his personal estate. In the ordinary case of the purchase of an estate, the assignment of a particular day or a specified place for the perfection of the title is considered as merely formal, the general object of the contract being the sale of an estate for a given sum, and the stipulation signifying that the purchase shall be completed promptly, and in a reasonable manner, regard being had to the circumstances of the case, and the nature of the title and property. Time may be made of the essence of the contract by express stipulation, or it may become essential by considerations arising from the nature of the property, or the character of the interest bargained. And the principle of the court of equity does not depend upon considerations collateral to the contract merely, nor on the conduct of the parties subsequently, showing that time was not of the essence of the contract in the particular case.

But it must affirmatively appear that the parties regarded time or place as an essential element in their agreement, or a court of equity will not so regard it. (Hiperall *v.* Knight, 1 Y. and C., 416.) In Parkin *v.* Thorald, (16 Beav., 59,) the master of the rolls said: "A contract is undoubtedly construed alike both in equity and at law; nay, more—a court of law is the proper tribunal for determining the construction of it. But courts of equity make a distinction in all cases between that which is matter of substance and that which is matter of form; and if it find that, by insisting on form, the substance will be defeated, it holds it to be inequitable to allow a person to insist on such form, and thereby defeat the substance. For instance, A has contracted to sell an estate to B, and to complete the title by the 25th October; but no stipulation is introduced, that either party considers time of the essence of the contract. A completes the title by the 26th; at law, the contract is at an end, and B may bring an action for the non-performance of the contract, and obtain damages for the breach; but equity holds, that unless B can show that the delay of twenty-four hours really produced some injury to him, he is not to be permitted to bring this action or to avoid the performance of the contract; not, certainly, on the ground that the 25th October was not a part of the contract, but on the ground that it is unjust that B should escape the performance of a contract which has been substantially performed by A, by reason of some omission in a formal but immaterial portion of it." Upon a view of the chancery record, our conclusions are, that the plaintiff, in good faith, attempted a literal per-

formance of his contract with Taylor; that the deposit of the money due, in a bank of solvency and credit, other than those named in the contract, did not inflict an injury upon Taylor, and the offer of its certificate of deposit, *prima facie*, was a substantial performance of its requirements. That his subsequent offer of the money and the interest that had accrued, and, on the refusal of Taylor to receive it, his prompt application to chancery, and payment of the money into court, relieve the plaintiff from every imputation of laches or delay. The District Court expressed an opinion corresponding to this, in July, 1852, in denying the motion to dissolve the injunction, and this was a virtual decision of the cause in that court.

These transactions occurred before the judgments against Taylor, under which the land was afterwards sold, were rendered by the District Court. The District Court had the parties before it, and held the defendant (Taylor) under restraint, by injunction, and the purchase-money in its custody. It had been empowered by a statute of the Territory "to pass the title to real estate by a decree, without any other act to be done on the part of the defendant, when, in its judgment, it was the proper mode to carry its decree into effect." (Rev. Stat., Minn., p. 466, sec. 33.) But, before the transfer to the plaintiff had been made, judgments were obtained and docketed against Taylor, which were "a lien upon all the real property of the debtor in the county owned by him at the date of the judgment, or afterwards acquired." The influence of these judgments, and of the levy of the executions upon the land described in the agreement of January, 1852, and the sale under those executions, remains to be considered. The twelfth of the "Ordinances in Chancery" of Lord Bacon is, that no decree bindeth any that cometh in *bona fide* by conveyance from the defendant before bill exhibited, and is made no party, neither by bill nor the order; but where he comes in *pendente lite*, and while the suit is in full prosecution, and without any color of allowance or privity of the court, there regularly the decree bindeth; but if there were any intermission of the suit, or the court made acquainted with, the court is to give order upon the special matter according to justice. The rule has been applied with steadiness to all cases of transfer during the progress of a cause, notwithstanding the hardship of individual cases, from considerations of public policy and convenience. Suits would be interminable, if the rights of the parties could be disturbed by mesne conveyances, and a necessity imposed for the introduction of other parties upon the record. The apparent exception to the rule arises when an event occurs which deprives the party on the record not only of his interest in the subject of

the suit, but also of his faculty to comply effectively with the decree of the court. In such a case, additional parties are necessary to enable the court to make an operative decree. The Court of Chancery ordinarily acts *in personam;* and, in cases like the present, perfects the title of the purchaser by requiring the vendor to execute a title conformably to the agreement. But, in cases of bankruptcy and insolvency, the bankrupt or insolvent is stripped of his rights of property and of his capacity to defend suits in which he is a party. In such cases the assignees are commonly made parties, (Dan'l Pr., 328;) but there are opposing authorities—Cleveland *v.* Boerun, (23 Barb., 201.) And it has been decided that a purchaser under an execution issued on a judgment rendered *pendente lite,* need not be made a party in such a case. (Scott *v.* Coleman, 5 Mon., 73.)

The statute we have cited from the code of Minnesota enlarges the powers of the Court of Chancery of that Territory, and enables it to act *in rem.* It may pass the title without any act of the defendant. The bill, subpœna, and injunction, placed the property wholly under the control of the Court of Chancery, and new parties were not requisite to enable the court to vest the title in the equitable claimant.

This principle is not peculiar to courts of chancery; but the maxim that *"pendente lite nihil innovetur,"* is applied in real and mixed actions by the common law. (2 Dana, 25; 9 Cowen, 233.)

Was there a valid exercise of the jurisdiction of the court, and did the decree pass the title to the purchaser? Had the plaintiff any duty to perform, in regard to the application of the purchase-money, in the registry of the court? Some authorities affirm that a purchaser of the legal title at a judicial sale immediately succeeds to the rights of the debtor, and that the equitable claimant under an executory contract becomes responsible to him for the purchase-money remaining unpaid. (Mayer *v.* Hinman, 17 Barb., 137; 16 Serg. and R., 18.) Other authorities recognise the right of the purchaser to the benefit of the contract from the time that the equitable claimant has notice of the sale and conveyance by the sheriff. (Mayer *v.* Hinman, 3 Kiernon, 180: 2 Ired. Eq., 507; 4 Madd. R., 506, note;) while other well-considered cases deny that the purchaser at the sheriff's sale obtains a title which can be interposed to impede the progress of the legal title to the purchaser by articles, or operates as a transfer of his debt for the unpaid purchase-money from his vendor to the claimant under the judgment. (Chinn *v.* Butts, 3 Dana Ky. R., 547; Lodge *v.* Lysely, 4 Simon, 70; Whitworth *v.* Gauvain, 3 Hare, 416; Scott *v.* Coleman, 5 Mon., 73.) The case reported in 3d Dana was a contest between two

purchasers—one under an executory contract, and the other under a judgment against the vendor while a part of the purchase-money remained unpaid. The holder of the sheriff's title recovered in an ejectment; and the questions decided arose on a bill for relief filed by the defendant upon his elder equitable title. The court say, that "the purchase of the entire legal title, with notice of an outstanding equity, arising from a previous sale of the land by the same vendor to a stranger, does not *per se* transfer to the purchaser any right, legal or equitable, to any portion of the unpaid consideration remaining due to the vendor from the first buyer; and if there should be any extraneous ground for an equitable substitution, it should be asserted and shown by the purchaser before the stranger holding the prior equity had made full payment to the vendor. If there be such an equity, it is against the vendor, and not against the debtor; and, whether it exist or will ever be asserted, the debtor cannot be presumed to know."

Without attempting to reconcile these cases, or to discover whether that is possible, it is evident that the present case does not fall within the limits of either of them. The right of the plaintiff to precedence over the judgment creditor, or the purchaser under his execution, does not depend upon the exercise of the extraordinary jurisdiction of the Court of Chancery, and is not confined by the rules under which that court administers that jurisdiction. His priority is a legal right, reposing upon the legislative authority. Before the judgment creditor had established his debt, the plaintiff had acquired possession of the property, and had paid his money into court. His purchase-money was thus paid. If the purchasers from the sheriff acquired any title to that money by their purchase of the land, it is evident that it should have been asserted by a direct appeal to the court, and not by an adversary proceeding at law for the land. If a person *pendente lite* takes an assignment of the interest of one of the parties to the suit, he may, if he pleases, make himself a party by bill, but he cannot by petition pray to be admitted as a party defendant; all that the court will do is to make an order that the assignor shall not take the property out of court without notice. (Dan'l Ch. Pr., 329; Wiswall *v.* Simpson, 14 How. S. C. R., 52.)

We do not consider that the act of Taylor in consenting to a decree, or the act of the plaintiff in accepting one, is evidence of any fraud, or of a conspiracy against the defendants in this suit. The decree was a consequence of the opinion of the court upon the cause as presented by the pleading, on the motion to dissolve the injunction; and so far as the equities of the parties are to be considered, the decree embodies them.

There is no other specification of fraud, and the general charges of fraud, unaccompanied by a statement of the facts constituting the fraud, have no effect or influence.

We are of opinion that there is no error in the record, and the judgment of the Supreme Court of Minnesota Territory is affirmed.